IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FMC CORPORATION, ) <br> ) <br> Defendant, ) <br> ) <br> v. ) <br> ) <br> SHOSHONE-BANNOCK TRIBES, ) <br> ) <br> Intervenor. ) <br> _____ ) | Case No. CV-98-0406-E-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it the Tribes' Motion for Clarification and Application for Preliminary Injunction. The Court heard oral argument on February 16, 2006, and took both motions under advisement. For the reasons expressed below, the Court will grant the Motion for Clarification and deem moot the Application for Preliminary Injunction.

**Memorandum Decision and Order – Page 1**

## FACTUAL BACKGROUND

FMC produced phosphorus at a plant located on fee land within the Shoshone-Bannock Fort Hall Reservation. FMC historically stored the waste from its plant in ponds on that property.

FMC's waste storage system was challenged by the Government in 1997 as being in violation of the Resource Conservation and Recovery Act (RCRA). The Government, FMC, and the Tribes entered into negotiations over these charges. At the same time, FMC was negotiating with the Tribes over whether FMC had to obtain a Tribal waste permit to conduct its waste storage program.

In 1998, FMC's negotiations on both fronts resulted in agreements. FMC settled the waste permit issue by entering into an agreement with the Tribes formed by a series of letters. In a letter dated May 19, 1998, the Tribes set forth the terms of the agreement in detail, providing that FMC would pay the Tribes a fee of $1.5 million a year to cover hazardous and nonhazardous waste, beginning in 1998, and continuing "for every year thereafter . . . ." *See Exhibit 2*, letter dated May 19, 1998. FMC responded in a letter dated June 2, 1998, clarifying the terms to ensure that the "$1.5 million annual fee would continue to be paid for the future even if the use of the ponds 17-19 was terminated in the next several years." *See Exhibit F to Declaration of Edmo*.

**Memorandum Decision and Order – Page 2**

A few months after entering into that agreement with the Tribes, FMC settled its RCRA dispute with the Government by signing a Consent Decree. It required FMC to build a Land Disposal Restriction Treatment Plant (LDR Plant) to treat the waste and eliminate the waste storage ponds on its work site. The project was labeled in the Decree as the "Work," and the Decree set a deadline for FMC to complete the "Work."

The Government did file suit against FMC under RCRA, but simultaneously presented the Consent Decree to this Court for approval to settle the suit. The Tribe objected to the Decree, and the Court allowed the Tribes to intervene to present its objections. After hearing from all parties, the Court approved the Decree, *see Order filed July 13, 1999* (docket no. 27), and the Ninth Circuit affirmed that decision. *See United States v. Shoshone-Bannock Tribes,* 229 F.3d 1161 (unpublished disposition) (9th Cir. 2000).

To begin construction of the LDR Plant, FMC applied for a building permit with the Tribes. The Tribes' Land Use Planning Council (LUPC) denied the permit, and demanded that all construction cease. FMC grew concerned that lengthy appeals through the Tribes' administrative process would affect its ability to meet the Government's deadline for work completion. Consequently, FMC moved for a declaratory judgment in this Court that it had complied with the

**Memorandum Decision and Order – Page 3**

requirement in the Consent Decree that it apply for all necessary permits, and that it should be allowed to continue construction despite the Tribes' denial of the application.

The Court began its analysis of FMC's motion by affirming FMC's reading of the Consent Decree that it was required to apply for a Tribal permit:

> The Consent Decree itself contemplated that FMC would need to go through the Tribes' land use planning system. Specifically, paragraph 8 of the Agreement states that "[w]here any portion of the Work requires a . . . tribal permit or approval, [FMC] shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals."

*See Memorandum Decision filed January 18, 2001* at p. 2 (Docket No. 56). Not only was FMC required to apply for the permit, the Court held, but it also was required to proceed through the Tribes' administrative process before bringing a challenge in this Court: "By waiting until the Tribal appellate entities had a full opportunity to review the LUPC's decision, the Court would be recognizing the Tribes' sovereignty over land use issues for projects with Reservation boundaries." *Id*. at p. 4 (citing *National Farmers Union Ins. v. Crow Tribe of Indians*, 471 U.S. 845 (1985)). The Court therefore denied FMC's motion, and directed it to proceed with an appeal though the Tribal administrative process.

During this time period – from 1998 to 2001 – FMC had been paying to the Tribes each year the $1.5 million waste fee agreed upon in the series of letters

**Memorandum Decision and Order – Page 4**

discussed above.  In December of 2001, FMC ceased all mineral processing operations at the site.  *See Bartholomew Declaration* at ¶ 16, p. 10 (John Bartholomew is FMC's Director of Operations).  Shortly thereafter, FMC declined to pay the $1.5 million fee for the year 2002.

In a letter dated May 10, 2002, Blaine Edmo, the Chairman of the Fort Hall Business Council, demanded that FMC pay the fee.  FMC responded in a letter dated May 23, 2002.  That letter contained an attached memo, from FMC's Legal Department, entitled "FMC Legal Comments re: Tribal Waste Fee."  The memo concluded that FMC no longer owed the fee because, among other reasons, the Tribes failed to comply with a condition of the agreement.  More specifically, FMC argued that the agreement required the Tribe to codify the fee to "ensure that [it] remains the same in the future."  *See Exhibit F to Declaration of Edmo*.  FMC asserted that because the Tribes had never codified the fee, FMC's obligation had ended.

The memo goes on to add that because FMC is no longer disposing of waste in ponds 17-19, no waste permit requirement could apply to those ponds. Although the waste ponds continued to exist on the property, FMC cited the waste permit ordinance relied upon by the Tribes, and interpreted it to apply only to "the act of disposal itself, rather than the mere existence of the disposal unit

**Memorandum Decision and Order – Page 5**

[*i.e.,*ponds]." *See Exhibit F to Edmo Declaration.*

Negotiations over the waste fee continued. In 2003, FMC proposed to transfer ownership of certain property to the Tribes "in lieu of paying the permit fee." *See Edmo Declaration* ¶ 13, p. 4.

Also during this period, FMC and the Tribes were negotiating over the Tribes' demand that FMC obtain a building permit to disassemble the FMC plant. When FMC questioned whether a building permit was required, the Tribes responded with a letter dated May 5, 2004, setting forth in detail the applicable sections of the Tribes' Land Use Policy Ordinance and the Uniform Building Code. The Tribes demanded that all work cease until FMC obtained the building permit.

At this point, the Tribes were demanding that FMC (1) pay the $1.5 million annual waste fee, and (2) obtain a building permit for the disassembly work. The Tribes were threatening to bring an enforcement action to halt FMC's work unless FMC agreed to these demands.

FMC responded on May 27, 2004, by repeating its offer to transfer land to the Tribes in return for the Tribes staying any regulatory enforcement of their demands. Further negotiations ensued, as evidenced by letters in the record. They were not successful.

**Memorandum Decision and Order – Page 6**

On September 19, 2005, the Tribes filed in this Court a Motion for Clarification of Consent Decree. By that motion, the Tribes seek to (1) conduct site inspections of FMC's work, (2) receive FMC documentation of work activities, and (3) require FMC to apply for a Tribal building permit and a waste permit.

In a letter dated December 9, 2005, the Tribes identified the permits they demanded that FMC obtain. The letter stated in pertinent part that FMC was required to "apply for and obtain a Special Use Permit for hazardous waste storage, treatment, and disposal, and an additional building permit for the demolition activities currently underway at the FMC site." The letter went on to detail the specific provisions of Tribal ordinances that required FMC to obtain these permits.

FMC has persisted in refusing to apply for these permits, although the Tribes concede that FMC has "to some degree relented in its refusal to allow Tribal inspections and provide requested documents." *See Tribes' Reply Brief on Motion for Clarification* at p. 3. Consistent with that representation, the oral argument of all counsel before this Court focused exclusively on the permit issues. Accordingly, the Court will assume that no decision is now necessary on the inspection and documentation issues, and that the sole issue is whether the Consent Decree requires FMC to comply with Tribal permitting requirements.

**Memorandum Decision and Order – Page 7**

Concerned that their Motion for Clarification may not be resolved before FMC finished its work at the site, the Tribes also moved for a preliminary injunction. Indeed, about a week before this Court's hearing on the Tribes' motions, FMC filed its Certificate of Completion of the "Work" under the Consent Decree with the EPA. All parties agree that the next step is for the EPA to determine whether that "Work" is in fact complete. If it is, the EPA will issue to FMC an Acknowledgment of Completion.

## ANALYSIS

**1.      Motion for Clarification of Consent Decree**

To a large degree, the Court's earlier decision of 2001 answers the Tribes' Motion for Clarification: Paragraph 8 of the Consent Decree requires FMC to apply for Tribal permits, and *National Farmers* requires FMC to exhaust its Tribal remedies before seeking relief here.

FMC responds that the Decree only requires it to apply for permits when the "Work" requires a tribal permit. Because it has decided that the waste and building permits are not required, FMC asserts that it need not apply for those permits.

FMC's interpretation removes the Tribe from any role in land use permit decisions – if FMC believes the permit is not required, it need not apply and the Tribe is powerless to argue otherwise. However, this is not at all what the Court

**Memorandum Decision and Order – Page 8**

contemplated when it approved the Consent Decree. At that time, the Court read the Consent Decree not to give FMC complete discretion to determine which permits were required, but instead to require FMC to apply for those Tribal permits that the Tribe had specifically identified as required. On the basis of that interpretation, the Court approved the Consent Decree. Consistent with that reading, the Court stated, in denying FMC's motion for declaratory judgment, that the Court was "recognizing the Tribes' sovereignty over land use issues for projects within Reservation boundaries." *See Memorandum Decision* at p. 4.

There is no indication whatsoever in the Decree that the Tribe was being stripped of that sovereignty. The only reasonable interpretation of ¶ 8 is that it requires FMC to apply for those permits that the Tribes had specifically identified as being required. At the same time, ¶ 8 does not dictate any result. Paragraph 76 of the Decree states that it "shall not be construed as a ruling or determination of any issue related to any . . . tribal . . . permit . . . ." While it does not dictate results, ¶ 76 reaffirms ¶ 8 by requiring that FMC "shall remain subject to all such permitting requirements."

FMC argues that "no specific tribal permit has been identified by the Tribes," and thus FMC cannot be compelled to apply for some unspecified permits. *See FMC Brief on Motion for Clarification* at p. 7. The Court disagrees.

**Memorandum Decision and Order – Page 9**

The Tribes' letter of December 9, 2005, discussed in detail above, identifies the permits FMC must apply for, and describes the legal basis for the Tribes' assertions. This letter puts FMC on notice of the specific permits that the Tribes are demanding. That is precisely the notice envisioned by the Court at the time it approved the Consent Decree.

FMC argues next that the Tribes are not signatories to the Decree and cannot claim third-party beneficiary status. Generally, consent decrees are governed by principles of contract law. *Hook v. State of Arizona*, 972, F.2d 1012, 1015 (9th Cir. 1992). "In contract law, third party beneficiaries of the government's rights under a contract are normally assumed to be only incidental [not intended] beneficiaries and are precluded from enforcing the contract absent a clear expression of a different intent." *Id*.

The Decree at issue here contains numerous indications that the Tribes are an intended third party beneficiary. At the very beginning of the Decree, in the Definitions section, the word "Tribe" is defined as "the Shoshone-Bannock Tribe residing on the Fort Hall Reservation . . . ." That definition is necessary because the word "Tribe" is frequently mentioned throughout the Decree as the recipient of various benefits, including, but not limited to, the following: (1) To receive notification from FMC of any change of ownership in the plant, *see* ¶ 7; (2) To

**Memorandum Decision and Order – Page 10**

require FMC to apply for Tribal permits, *see* ¶ 8; (3) To obtain "access at all reasonable times" to the plant for various enumerated purposes, *see* ¶ 13; (4) To receive notices required by the Decree, *see* ¶¶ 19-21; (5) To be invited to attend any inspection conducted by the EPA after FMC files its Certificate of Completion, *see* ¶ 36; and (6) For "a reasonable opportunity for review and comment" before the EPA issues any Acknowledgment of Completion to FMC, *see* ¶ 38.

By conferring numerous benefits on the Tribes, the parties to the Decree make it clear that the Tribes are an intended – and not merely an incidental – beneficiary. FMC responds, however, that ¶ 77 of the Decree disclaims any intent to benefit the Tribes. That provision states that "[n]othing in this Consent Decree is intended . . . to create any rights in or grant any cause of action to any person not a party to this Consent Decree . . . ." FMC argues that this provision bars the Tribes from claiming third-party beneficiary status.

The Court disagrees for two reasons. First, ¶ 77 fails to mention the term "third-party beneficiary." It would have been easy to name the doctrine and exclude it from application. The Paragraph's failure to do so is a strong indication that it did not intend to do so.

Second, ¶ 77 only applies to "*any person* not a party." While corporations and other legal entities may be defined as "persons" at times, the Tribes are not a

**Memorandum Decision and Order – Page 11**

"person" in either legal or common parlance. Instead, the Tribes are defined in the Decree itself, not as a "person," but as the "Shoshone-Bannock Tribe."

Given the fact that preceding paragraphs of the Decree had conferred numerous benefits on the Tribes, it would have been odd indeed for ¶ 77 to withdraw them all – essentially saying "never-mind." Because the language of ¶ 77 cannot remotely be interpreted to command such an absurd result, the Court rejects FMC's interpretation.

FMC argues next that its work is done, and thus there is no work left that might be covered by a permit. That is essentially an argument that the permits identified by the Tribes do not apply. That argument may be submitted by FMC in the Tribal administrative process, and must be exhausted there before being raised in this Court.

FMC responds that the Tribes failed to follow the Dispute Resolution process outlined in ¶ 55 of the Consent Decree. However, that provision is applicable only to "parties," and that word is defined in the Definitions section to include only the Government and FMC, not the Tribes.

## 2.   CERCLA and the Motion for Clarification

The FMC plant site is a CERCLA Superfund Site. *See Declaration of Hartman*, ¶ 5, at p. 3. The Consent Decree covers only RCRA work, and does not

**Memorandum Decision and Order – Page 12**

cover the clean-up work FMC is doing under CERCLA supervised by the EPA.

FMC argues that the Tribes, through their permitting process, will require FMC to do work beyond that required by the Consent Decree and which is covered by CERCLA. For example, FMC points to the Tribes' complaints about radionuclides and potential groundwater discharges to the Portneuf River, and alleges that any Tribal permit requirements that FMC perform work in these areas would invade the province of the EPA's CERCLA clean-up efforts.

Because FMC has not yet applied for Tribal permits, the Court has no way of knowing what the Tribes will require in granting or denying those permits. Thus, this dispute is not yet ripe. Resolution of this issue must await FMC's permit applications and the Tribes' action on those applications.

### 3.     Tribal Jurisdiction Over FMC

Finally, FMC argues that the Tribe lacks jurisdiction. In *Montana v. United States*, 450 U.S. 544 (1981), the Supreme Court held that with two exceptions, the "inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe" on privately-owned fee lands within a reservation. *Id.* at 565. FMC owns the property at issue in fee. *See Bartholomew Declaration* at ¶ 3. Thus, *Montana* establishes that the Tribes have no jurisdiction over FMC unless one of its two exceptions applies.

**Memorandum Decision and Order – Page 13**

The first exception provides that "a tribe may regulate through taxation, licensing, or other means, the activities of non-members who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565-66. There must be a "fairly direct link" between the consensual relationship and the assertion of jurisdiction. *Ford Motor Co. v. Todecheene*, 394 F.3d 1170, 1179 (9th Cir. 2005).

Here, the Tribes and FMC entered into an agreement in 1998 to settle their waste permit dispute. It provided that FMC would pay $1.5 million annually, which it did until 2001, when it unilaterally refused to make further payments.

The payment can only be interpreted as a concession by FMC to Tribal jurisdiction over permitting. Whether FMC was paying the Tribes to obtain a waste permit – or was paying the Tribes to forgo enforcement action for failing to obtain a permit – either way, the payment was a recognition that the Tribes had jurisdiction over FMC to require it to obtain a waste permit.

While in other contexts FMC often expressly reserved its right to object to the Tribes' jurisdiction, there is no similar reservation of rights in the series of letters that comprise the agreement of the parties on the $1.5 million payment.[1]

---

[1] At oral argument, the Court asked FMC's counsel to identify where in the letters FMC had reserved its rights, and defense counsel was unable to identify any such reservation.

**Memorandum Decision and Order – Page 14**

Indeed, FMC's letter of May 23, 2002, containing its reasons for refusing to pay the $1.5 million fee, says nothing about the Tribes' lack of jurisdiction. Instead, the attached memo from FMC's Legal Department, discussed above, focuses almost entirely on interpretations of the Tribes' Land Use Ordinances, a recognition that those ordinances govern the dispute, and that the Tribe has jurisdiction.

The Court therefore finds that a consensual agreement under Montana exists in this case. *Ford Motor* requires a tight fit between that agreement and the dispute at issue here. That requirement is satisfied because both involve the Tribes' right to enforce its permit system.

FMC argues that the agreement has long-since expired because it applied only during the time that ponds 17-19 were in operation. This ignores, however, the letter of FMC's General Counsel Paul McGrath dated June 2, 1998, stating his understanding that "the $1.5 million annual fee would continue to be paid for the future even if the use of ponds 17-19 was terminated in the next several years." *See Exhibit F to Edmo Declaration.*

However, the agreement on the $1.5 million fee is not the only consensual agreement under *Montana* that exists in this case. The Consent Decree is another example. As the Court discussed above, the Tribes are an intended beneficiary of

**Memorandum Decision and Order – Page 15**

that Decree.

A third example comes from an FMC letter to the Tribes dated August 11, 1997, signed by J. David Buttelman, FMC's Health, Safety, and Environmental Manager. In that letter, Buttelman states that "[t]hrough the submittal of the Tribal "Building Permit Application" and the Tribal "Use Permit Application" for Ponds 17, 18, and 19, FMC Corporation is consenting to the jurisdiction of the Shoshone-Bannock Tribes with regard to the zoning and permitting requirements as specified in the current Fort Hall Land Use Operative Policy Guidelines." *See Exhibit 3*.

The consensual agreement exception of *Montana* is satisfied by (1) the agreement on the $1.5 million annual fee, (2) the Consent Decree, and (3) the Bettelman letter. For these reasons, the Tribes have jurisdiction over FMC to enforce the terms of the Tribal permit system.

## CONCLUSION

For the reasons expressed above, the Court will grant the Tribes' Motion for Clarification. The Court finds that (1) the Consent Decree requires FMC to apply for permits that the Tribes specifically identify as being required; (2) FMC may not refuse to apply for permits on the ground that FMC does not believe the permits to be applicable; (3) the Tribes have specifically identified the permits listed in the letter of December 9, 2005; (4) FMC is required to apply to the Tribes for the

**Memorandum Decision and Order – Page 16**

permits listed in the letter of December 9, 2005; (4) FMC may make its challenges to the applicability of the permits in the Tribal administrative process, and must exhaust that process, or identify a legal exception to the exhaustion doctrine, before seeking relief in this Court.

Given these rulings, the Court will deem moot the Tribes' Motion for Preliminary Injunction, without prejudice to the Tribes' right to re-file an injunction request should it become necessary.

The Government did file a brief in this matter basically taking no position. The Court's rulings, and a possible appeal by FMC, at least raise the question whether the EPA might be ready to issue an Acknowledgment of Completion to FMC before FMC exhausts the Tribal permit process.

The Court will not express an opinion at this time as to whether the EPA could issue an Acknowledgment of Completion under the Consent Decree before FMC had completed the Tribal permit process. That issue has not been briefed or argued. It is enough to say at this point that the Court would expect the EPA to keep all parties, including the Tribes, notified of its progress with regard to the approval of FMC's work, and give the Tribes full advance notice of any intent to issue a Acknowledgment of Completion to FMC.

**ORDER**

**Memorandum Decision and Order – Page 17**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Motion for Clarification (Docket No. 59) is GRANTED as set forth above.

IT IS FURTHER ORDERED, that the Application for Preliminary Injunction (Docket No. 76) is DEEMED MOOT as discussed above.

DATED: **March 6, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court